Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Frank P. Tiscione, Esq.
Philip P. Nash, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

LIBERTY MUTUAL INSURANCE COMPANY,
LIBERTY MUTUAL FIRE INSURANCE COMPANY,
LIBERTY INSURANCE CORPORATION, THE
FIRST LIBERTY INSURANCE CORPORATION, LM
INSURANCE CORPORATION, LIBERTY MUTUAL
MID-ATLANTIC INSURANCE COMPANY,
LIBERTY COUNTY MUTUAL INSURANCE
COMPANY, LM PROPERTY and CASUALTY
INSURANCE COMPANY, SAFECO COMPANY OF
INDIANA, and AMERICAN STATES INSURANCE
COMPANY,

Docket No.:_____ (      )

**Plaintiff Demands a Trial by Jury**

                    Plaintiffs,

        -against-

DAKIROKS PRODUCTS CORP. and JOHN DOE
DEFENDANTS 1-10,

                    Defendants.

-------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company,

Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance

Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company (collectively "Liberty Mutual" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.      This action seeks to recover more than $252,000.00 that the Defendants have wrongfully obtained from Liberty Mutual by submitting, and causing to be submitted, hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical collars, lumbar-sacral supports, orthopedic pillows, massagers, electronic heat pads, egg crate mattresses, etc.) (collectively, the "Fraudulent Equipment") through Defendant Dakiroks Products Corp. ("Dakiroks").

2.      Dakiroks purports to be a legitimate retailer of DME and OD owned by Oksana Pryzenko ("Pryzenko"), operating out of an address located in Brooklyn, New York. Dakiroks, however, was fraudulently incorporated, never obtained a Dealer in Products License as required by the City of New York, and was never truly owned, controlled or operated by Pryzenko. Pryzenko, whose actual existence cannot be verified, was used as the nominal owner of Dakiroks, to the extent she is even an actual person, in order to conceal the identifies of others not readily identifiable to Liberty Mutual (the "John Doe Defendants") who engineered a scheme to submit large volumes of billing to Liberty Mutual for purportedly providing Fraudulent Equipment to individuals who claimed to have been involved in automobile accidents in New York and were eligible for coverage under no-fault insurance policies issued by Liberty Mutual ("Insureds").

3.      To effectuate the scheme, Dakiroks and the John Doe Defendants (collectively, "Defendants") obtained medically unnecessary prescriptions from various healthcare providers

(the "Referring Providers") -- or purported to obtain such prescriptions despite some or all of the prescriptions not being actually authorized by the Referring Providers -- that Defendants then used to submit large volumes of billing to Liberty Mutual and other New York automobile insurance companies for purportedly providing Fraudulent Equipment that was medically unnecessary, illusory, and otherwise not reimbursable.

4.      Liberty Mutual seeks to recover more than $252,000.00 that has been wrongfully obtained by the Defendants and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $215,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the Defendants because:

(i)     The Defendants billed Liberty Mutual for Fraudulent Equipment purportedly provided to Insureds even though Dakiroks was ineligible to collect No-Fault Benefits because it was fraudulently incorporated and not lawfully licensed to provide the Fraudulent Equipment;

(ii)    The Defendants billed Liberty Mutual for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful financial arrangements;

(iii)   The Defendants billed Liberty Mutual for Fraudulent Equipment that was not medically necessary and provided – to the extent that any Fraudulent Equipment was provided – pursuant to prescriptions issued by the Referring Providers without regard for genuine patient care and as a result of predetermined fraudulent protocols in order to financially enrich the Defendants and others not presently known;

(iv)    The Defendants billed Liberty Mutual for Fraudulent Equipment that was provided – to the extent that any Fraudulent Equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

(v)     To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds; and

(vi)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently misrepresented that the charges were permissible and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

5.    The Defendants fall into the following categories:

(i)    Defendant Dakiroks is a New York corporation that purports to purchase DME and OD from wholesalers, purports to provide Fraudulent Equipment to automobile accident victims, and bills New York automobile insurance companies, including Liberty Mutual, for Fraudulent Equipment.

(ii)    John Doe Defendants 1-10 are citizens of New York and are presently not identifiable but are individuals who participated in the fraudulent scheme perpetrated against Liberty Mutual by, among other things, operating Dakiroks, engaging in illegal financial and kickback arrangements to obtain prescriptions for Fraudulent Equipment for the Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

6.    As discussed below, the Defendants always have known that the claims for Fraudulent Equipment submitted to Liberty Mutual were fraudulent because: (i) Dakiroks was fraudulently incorporated and not lawfully licensed to provide the Fraudulent Equipment by New York City as required by law; (ii) the Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – based upon prescriptions received as a result of unlawful financial arrangements; (iii) the prescriptions for Fraudulent Equipment were not medically necessary and were provided – to the extent that any Fraudulent Equipment was provided – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants; (iv) the Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – as a result of decisions made by laypersons, not by healthcare providers; (v) to the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided; and (vi) to the extent that any Fraudulent Equipment was provided to

Insureds, the bills for Fraudulent Equipment fraudulently misrepresented that the charges were permissible and grossly inflated the permissible reimbursement rate that the Defendants could have received.

7.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to Liberty Mutual through Dakiroks.

8.    The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to Liberty Mutual pursuant to the fraudulent schemes through Dakiroks.

9.    The Defendants' fraudulent scheme against Liberty Mutual and the New York automobile insurance industry began no later than August 2021 and the scheme continued uninterrupted since that time.

10.    As a result of the Defendants' fraudulent scheme, Liberty Mutual has incurred damages of more than $252,000.00.

## THE PARTIES

### I.    Plaintiffs

11.    Plaintiffs Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are Massachusetts corporations with their principal place of business in Boston, Massachusetts.  Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

12.    Plaintiffs Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are Illinois corporations with their principal place of business in Boston, Massachusetts.  Liberty Insurance Corporation, The First Liberty Insurance Corporation

and LM Insurance Corporation are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

13.     Plaintiff Liberty Mutual Fire Insurance Company is a Wisconsin corporation with its principal place of business in Boston, Massachusetts.  Liberty Mutual Fire Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

14.     Plaintiff Liberty County Mutual Insurance Company is a Texas corporation with its principal place of business in Boston, Massachusetts.  Liberty County Mutual Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

15.     Plaintiffs LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are Indiana corporations with its principal place of business in Boston, Massachusetts.  LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

II.     **Defendants**

16.     Defendant Dakiroks is a New York corporation with its purported principal place of business in Brooklyn, New York. Dakiroks was incorporated on August 10, 2021, and is owned on paper by Pryzenko.  Pryzenko does not exist, or at best was used as the nominal owner of Dakiroks as part of a scheme by the John Doe Defendants to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

17.     John Doe Defendants 1-10 are citizens of New York and are presently not identifiable but are individuals who participated in the fraudulent scheme perpetrated against Liberty Mutual by, among other things, operating Dakiroks, engaging in illegal financial and

kickback arrangements to obtain prescriptions for Fraudulent Equipment for the Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

19.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

20.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

21.    Liberty Mutual underwrites automobile insurance in the State of New York.

I.    **An Overview of the Pertinent Laws**

    A.    **Pertinent Laws Governing No-Fault Insurance Reimbursement**

22.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

23.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

24.    In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

25.    In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

26.    Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

27.    For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

28.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.  In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals reiterated that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits and noted concerns with having unlicensed persons involved in practicing medicine since they are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

29.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME and OD.

30.     Specifically, New York City's Administrative Code requires DME/OD suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer Affairs ("DCA") in order to lawfully provide DME or OD to the disabled, which is defined as "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". See 6 RCNY § 2-271; NYC Admin. Code §20-425.

31.     It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License.  See NYC Admin. Code §20-426.

32.     A Dealer in Products License is obtained by filing a license application with the DCA. The application requires that the applicant identify, among other pertinent information, the commercial address of where the DME/OD supplier is physically operating from.

33.     The license application for a Dealer in Products License also requires the applicant to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The affirmation to the application requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

34.     New York law also prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

35.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

36.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

37.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

38.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to Liberty Mutual, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

39.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to Liberty Mutual, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME and OD**

40.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

41.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

42.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars, lumbar supports, knee supports, ankle supports, wrist braces, and the like.

43.    To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

44.    In a June 16, 2004, Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

45.    As it relates to DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)    The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
>
> (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or
>
> (2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2

46.    As indicated by the New York Fee Schedule, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

47.    According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

48.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

49.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

50.     Where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as Liberty Mutual to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

51.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

52.    To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME Procedure Codes, the definitions for set forth by Palmetto control to determine whether an item of DME or OD qualify for reimbursement under a specific HCPCS Code.

53.    Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted and/or customized. Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

54.    The maximum reimbursement rates for providing DME or OD to automobile accident victims under the No-Fault Laws set forth above includes all shipping, handling, and delivery. See 12 N.Y.C.R.R. § 442.2(c). As such, DME/OD suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up of any DME or OD.

55.    Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)    The provider is in compliance with all significant statutory and regulatory requirements;

(ii)    The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)    The prescription for DME or OD is not based on any unlawful financial arrangement;

(iv)    The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(v)     The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(vi)    The fee sought for DME or OD provided to an Insured was not in excess of the price contained in the Medicaid Fee Schedule or the standard used for a Non-Fee Schedule item.

## II.    The Defendants' Fraudulent Scheme

### A.    Overview of the Defendants' Fraudulent Schemes

56.    Beginning in or about August 2021, the Defendants masterminded and implemented a complex fraudulent scheme in which Dakiroks was used to bill Liberty Mutual and other New York automobile insurers for hundreds of thousands of dollars in No-Fault Benefits to which they were never entitled to receive.

57.    The Defendants began billing Liberty Mutual through Dakiroks on August 22, 2021, only 12 days after it was first incorporated.  Billing continued to be submitted to Liberty Mutual through Dakiroks until April 29, 2022.

58.    Dakiroks purports to be a legitimate retailer of DME and OD owned by Oksana Pryzenko ("Pryzenko"), operating out of an address located in Brooklyn, New York. Dakiroks, however, was fraudulently incorporated, never obtained a Dealer in Products License as required by the City of New York, and was never truly owned, controlled or operated by Pryzenko, who likely does not exist.

59.    Liberty Mutual attempted to verify the existence of Pryzenko, but name, address, and database searches for Pryzenko returned no results.  Liberty Mutual conducted a site visit to the incorporation address for Dakiroks, which revealed only a shuttered storefront bearing the name Helpful Medical Supply.  Attempts to call the phone number included on documents submitted by Dakiroks to Liberty Mutual revealed that the phone number was no longer in service. Further attempts to verify the existence of Pryzenko through the accounting firm listed on the

incorporation documents for Dakiroks were fruitless, as the accounting firm stated they could not find any entry in their system for Dakiroks.

60.     The Defendants falsely represented in the certificate of incorporation filed with New York State that Pryzenko was the true shareholder and owner of Dakiroks and that she truly owned, controlled and operated the corporation. Pryzenko, however, to the extent she actually exists, exercised absolutely no control over or ownership interest in Dakiroks.  Instead, Pryzenko was used as the nominal owner of Dakiroks in order to conceal the identifies of the John Doe Defendants who engineered the scheme to submit large volumes of billing to Liberty Mutual for purportedly providing Fraudulent Equipment to Liberty Mutual Insureds.

61.     As part of the scheme, the Defendants used illegal kickback arrangements to generate multiple prescriptions for virtually identical Fraudulent Equipment purportedly issued by Referring Providers who rendered treatment to Insureds at various multidisciplinary medical clinics (the "Clinics"), which prescriptions were routed directly to Dakiroks.

61.     From August 22, 2021 through April 29, 2022, the Defendants submitted more than $467,000.00 in fraudulent claims to Liberty Mutual under the name of Dakiroks seeking reimbursement for Fraudulent Equipment. To date, the Defendants have wrongfully obtained more than $252,000.00 from Liberty Mutual, and there is more than $215,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment from Liberty Mutual.

62.     The Defendants used Dakiroks to directly obtain No-Fault Benefits and maximize the amount of No-Fault Benefits they could obtain by submitting fraudulent bills to Liberty Mutual and other automobile insurers seeking reimbursement for Fee Schedule and Non-Fee Schedule items.

63.     The Defendants were able to perpetrate the fraudulent scheme against Liberty Mutual described below by obtaining prescriptions for Fraudulent Equipment because of secret agreements with third-party individuals at the Clinics.

64.     The Referring Providers issued prescriptions for Fraudulent Equipment to virtually every Insured that was injured in a motor vehicle accident and treated at a particular Clinic, and many of those prescriptions were be provided to the Defendants in exchange for various forms of consideration that the Defendants provided to others associated with the Clinics.

65.     As part of the fraudulent scheme, Dakiroks received prescriptions for Fraudulent Equipment purportedly issued by Referring Providers from the following Clinics:

(i)      127 Post Avenue, Westbury, New York;

(ii)      164-10 Crocheron Avenue, Flushing, New York;

(iii)     170-04 Henley Road, Jamaica, New York;

(iv)     221-05 Jamaica Avenue, Queens Village, New York;

(v)      243-51 Merrick Boulevard, Rosedale, New York;

(vi)     2598 3rd Avenue, Bronx, New York;

(vii)    30 South Central Avenue, Valley Stream, New York;

(viii)   3432-05 East Tremont Avenue, Bronx, New York;

(ix)     4226A 3rd Avenue, Bronx, New York;

(x)      450 West Merrick Road, Valley Stream, New York;

(xi)     607 Westchester Avenue, Bronx, New York; and

(xii)    6937 Myrtle Avenue, Glendale, New York.

66.    The Defendants received prescriptions for Fraudulent Equipment issued by the Referring Providers as part of the unlawful financial arrangements with third parties who are not presently identifiable, directly from the Clinics and without going through the Insureds.

67.    As part of the scheme, and in a way to maximize the amount of money that the Defendants could obtain from Liberty Mutual and other automobile insurers, the prescriptions for Fraudulent Equipment that were purportedly issued by the Referring Providers and provided to the Defendants were generic and vague in that the descriptions on the prescription forms could apply to multiple types of DME or OD.

68.    Once the Defendants received the vague and generic prescriptions purportedly issued by the Referring Providers, the Defendants would submit either NF-3 or HCFA-1500 forms to Liberty Mutual seeking reimbursement for specific types of Fee Schedule and Non-Fee Schedule items with HCPCS Codes that were not directly identified or not clearly identified in the prescriptions.

69.    By submitting bills to Liberty Mutual seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Defendants indicated that they provided Insureds with the particular item associated with each unique HCPCS Code and that such specific item was medically necessary as determined by a Referring Provider, when the Fraudulent Equipment purportedly provided to Insureds and the HCPCS Codes referenced on the bills to Liberty Mutual were actually based upon the decisions by individuals who were not licensed to prescribe DME and/or OD, such as Pryzenko, together with the John Doe Defendants.

70.    The Defendants tried to maximize the amount of No-Fault Benefits that they could obtain from Liberty Mutual, and other automobile insurers, by submitting bills to Liberty Mutual

that misrepresented the Fraudulent Equipment purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

71.    In a substantial majority of the charges for Fee Schedule items identified in Exhibit "1" – to the extent that any Fraudulent Equipment was actually provided to Insureds – the Fraudulent Equipment for Fee Schedule items did not match the HCPCS Codes identified in the bills submitted to Liberty Mutual by the Defendants.

72.    For example, to the extent that any Fraudulent Equipment was provided to the Insureds, the Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment that did not contain all the features required by the HCPCS Codes identified on the Defendants' bills to Liberty Mutual.

73.    The Defendants engaged in a pattern of submitting bills to Liberty Mutual, and other automobile insurers, seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates under the Medicaid Fee Schedule.

74.    In furtherance of their scheme to defraud Liberty Mutual and other automobile insurers, the Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public for the same item.

75.    In actuality, the bills from the Defendants submitted to Liberty Mutual for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public.

76.    As part of this scheme, the Defendants submitted bills to Liberty Mutual with reimbursement rates that indicated the Non-Fee Schedule items purportedly provided Insureds

were expensive and high-quality when the Non-Fee Schedule items provided were cheap and poor-quality, and were purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.

77.    In fact, the cheap and poor quality Non-Fee Schedule items provided to the Insureds – again, to the extent that any Non-Fee Schedule item was actually provided – were easily obtainable from legitimate internet or brick-and-motor retailers for a small fraction of the reimbursement rates identified in the bills submitted to Liberty Mutual by the Defendants.

78.    The Defendants submitted bills to Liberty Mutual and other automobile insurers seeking No-Fault Benefits for Non-Fee Schedule items at rates that were grossly above the permissible reimbursement rate for Non-Fee Schedule items to maximize the amount of No-Fault Benefits that they could receive.

79.    After fraudulently incorporating Dakiroks and obtaining medically unnecessary prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers as a result of unlawful financial arrangements, the Defendants would bill Liberty Mutual for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fee Schedule items that did not represent the HCPCS codes contained in the bills to Liberty Mutual; (iv) Non-Fee Schedule items at grossly inflated reimbursement rates; and (v) Fraudulent Equipment that was otherwise not reimbursable.

**B.    Defendants' Failure to Comply with Local Licensing Provisions**

80.    As stated above, the Defendants falsely represented in the certificate of incorporation filed with New York State that Pryzenko was the true shareholder and owner of Dakiroks and that she truly owned, controlled and operated the corporation.

81.     Pryzenko, however, either does not actually exist or exercised absolutely no control over or ownership interest in Dakiroks.

81     Further, for a DME/OD supplier to provide DME or OD to automobile accident victims within the City of New York, the DME/OD supplier must receive a Dealer in Products License by the DCA.

81.     Dakiroks purported to operate out of an address located in Kings County and an overwhelming majority of the Insureds identified in Exhibit "1" were located within the City of New York.

82.     For the Defendants to lawfully provide DME/OD to the Insureds identified in Exhibit "1", the Defendants were required to obtain a Dealer in Products License from the DCA.

83.     However, Dakiroks never obtained a Dealer in Products License, and was thus not lawfully permitted to sell, rent, fit, or adjust any DME/OD for Insureds within the City of New York.

84.     As a result, the Defendants were never entitled to receive No-Fault Benefits because they failed to comply with all significant statutory and regulatory requirements by operating as a DME/OD supplier within the City of New York without a valid Dealer in Products License.

85.     In each of the claims identified in Exhibit "1," the Defendants fraudulently misrepresented that Dakiroks was properly incorporated and properly licensed with all local statutory and regulatory requirements, and was lawfully permitted to provide DME/OD to Insureds when,in fact, Dakirocks was never eligible to collect No-Fault Benefits in the first instance because Dakiroks was never lawfully incorporated and never obtained a Dealer in Products License.

C.      **The Defendants' Illegal Financial Arrangements**

86.     In order to obtain access to Insureds so the Defendants could implement and execute their fraudulent schemes and maximize the amount of No-Fault Benefits the Defendants could obtain from Liberty Mutual and other New York automobile insurers, the Defendants entered into illegal agreements with unidentified persons associated with the Clinics where prescriptions for Fraudulent Equipment were provided to the Defendants in exchange for financial consideration.

87.     Since Dakiroks' inception, the Defendants engaged in unlawful kickback arrangements to obtain prescriptions for Fraudulent Equipment from the Clinics. These schemes allowed the Defendants to submit hundreds of claims for Fraudulent Equipment to Liberty Mutual and other New York automobile insurers in New York.

88.     Pursuant to the unlawful financial arrangements, the Defendants would pay kickbacks to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers at the Clinics.

89.     As explained in more detail below, the Defendants received prescriptions purportedly issued by Referring Providers who worked at various Clinics, including Clinics located at 4226A 3rd Avenue, Bronx, New York (the "3rd Ave. Clinic") and 6937 Myrtle Avenue, Glendale, New York (the "Myrtle Ave. Clinic"). These prescriptions for Fraudulent Equipment from each Referring Provider were not medically necessary as they contained a predetermined set of virtually identical Fraudulent Equipment.

90.     In keeping with the fact that the Defendants obtained prescriptions for Fraudulent Equipment because of unlawful financial arrangements with others who are not presently identifiable, multiple charges identified in Exhibit "1" are based upon prescriptions for Fraudulent

Equipment that were never actually issued, signed, or otherwise authorized by the Referring Provider. Instead, the prescriptions for Fraudulent Equipment were created by others who are not presently known and were provided to the Defendants as part of the unlawful financial arrangements.

91.     For example, one of the purported the Referring Providers, Phyllis Gelb, M.D., advised Liberty Mutual that DME that was provided by Dakiroks was not actually prescribed by her even though her name is on the prescription form. In fact, she never made prescriptions to Dakiroks. In addition, Dr. Gelb advised Liberty Mutual that if she would ever prescribe DME, which was rare, it would only be for cervical pillows and possibly a TENS unit, although Dakiroks purportedly dispensed many other DME items that was purportedly prescribed by Dr. Gelb.

92.     Further, another of the Referring Providers, Dr. Michael Alleyne, advised Liberty Mutual that the many of the types of DME provided by Dakiroks were actually filled in or checked off by someone other than himself on prescriptions, as he would not have prescribed the DME that was purportedly provided by Dakiroks.

93.     In further support of the fact that the Defendants obtained prescriptions for Fraudulent Equipment based on unlawful financial arrangements, prescriptions for Fraudulent Equipment originated at multiple Clinics known to Liberty Mutual as generating claims that were submitted to Liberty Mutual for services that were performed without the treating healthcare providers' knowledge or authorization, including at the 3rd Ave. Clinic and Myrtle Ave. Clinic.

94.     In keeping with the fact that the Defendants obtained prescriptions for Fraudulent Equipment as a result of unlawful financial arrangements, the Defendants: (i) received virtually identical predetermined sets of prescriptions from multiple Referring Providers operating out of the same Clinic; (ii) received prescriptions for Fraudulent Equipment that were never actually

signed by the Referring Providers; and (iii) obtained prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

95.     In also keeping with the fact that, as the result of unlawful financial arrangements, the Defendants obtained prescriptions for Fraudulent Equipment purportedly issued by but never actually signed by the Referring Providers, multiple claims identified in Exhibit "1" were based upon prescriptions for Fraudulent Equipment that contained stamped signatures of the Referring Provider who purportedly issued the prescription, or were purportedly issued on dates the Referring Provider never treated or otherwise met with the Insured.

96.     In keeping with the fact that the Defendants obtained the prescriptions for Fraudulent Equipment directly from the Clinics and without any involvement by Insureds, and in some instances without any involvement by the Referring Provider, the prescriptions purportedly issued by the Referring Providers were provided directly to the Defendants from persons working at or associated with the Clinics.

97.     Furthermore, and to the extent that the Insureds received any Fraudulent Equipment, in many cases, the Insureds were provided with Fraudulent Equipment directly from the Clinics without any interaction with the Defendants.

98.     In all the claims identified in Exhibit "1", the Defendants falsely represented that Fraudulent Equipment were provided pursuant to lawful prescriptions from healthcare providers, and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

**D.     The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols**

99.     In addition to the Defendants' unlawful financial arrangements, the Defendants obtained prescriptions for Fraudulent Equipment issued pursuant to predetermined fraudulent

protocols, which were designed to maximize the billing that the Defendants could submit to insurers, including Liberty Mutual, rather than to treat or otherwise benefit the Insureds.

100.    In the claims identified in Exhibit "1", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

101.    Concomitantly, almost none of the Insureds identified in Exhibits "1", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

102.    However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the Referring Providers were subject to extremely similar and extensive treatment, by multiple healthcare providers, including being issued nearly identical prescriptions for Fraudulent Equipment.

103.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

104.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

105.    In general, the Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers pursuant to the following predetermined fraudulent protocols:

- an Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

- the Insured would be seen by a Referring Provider;

- on the date of the first visit, the Referring Provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME and/or OD;

- subsequently, the Insured would return to the Clinic for one or more additional evaluations and treatment by multiple other healthcare providers, and would be provided with at least one additional prescription for a predetermined set of DME and/or OD, although the Referring Provider did not always treat the Insured on the date of the additional prescription for DME and/or OD; and

- at least one, if not more than one, prescription for DME and/or OD would be directly provided to the Defendants to fill and was without any involvement by the Insured.

106.    Virtually all of the claims identified in Exhibit "1" are based upon medically unnecessary prescriptions for predetermined sets of Fraudulent Equipment, which were purportedly issued by the Referring Providers who practiced at various Clinics across the New York metropolitan area.

107.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patient's individual symptoms or presentation.

108.    Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider may – but not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

109.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and

medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

110.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

111.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

112.    If a healthcare provider determines that DME and/or OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed and why any of the prescribed equipment was medically necessary or how it would help the Insureds.

113.    It is improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibit "1" who treated at a Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

114.    Here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibit "1" that treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment.

115.    In keeping with the fact that the prescriptions for Fraudulent Equipment used by the Defendants to support the charges identified in Exhibit "1" were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, many of the prescriptions were purportedly issued on dates that the Insureds never even treated with the Referring Providers who purportedly issued the prescription.

116.    Also, in keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols, and not for the benefit of the Insureds – as set forth below – the Referring Providers all issued similar checkmark-based prescriptions and routinely issued multiple checkmark-based prescriptions to a single patient on the same day when there was no legitimate reason to do so.

117.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to predetermined fraudulent protocols, to the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain the medical utility for – and oftentimes failed to even identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill Liberty Mutual for the charges identified in Exhibit "1".

118.    In further keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibit "1" were not medically necessary but were the result of predetermined fraudulent protocols, the prescriptions typically contained vague and generic descriptions for DME and OD, which – as explained in more detail below – provided the Defendants with the opportunity to purportedly provide – and bill Liberty Mutual for – whatever DME or OD they wanted.

119.    Even more, and as also explained below in more detail, the charges to Liberty Mutual identified in Exhibit "1" were not based upon prescriptions for medically necessary Fraudulent Equipment because the Defendants purportedly provided Insureds with whatever DME or OD that they wanted, even when the Fraudulent Equipment purportedly provided – and billed to Liberty Mutual – was not the item identified in the prescriptions purportedly issued by the Referring Providers.

120.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were issued because of predetermined fraudulent protocols and not based upon medical necessity, multiple prescriptions identified in Exhibit "1" were not actually issued by certain Referring Providers listed on the prescriptions. Instead, in those circumstances, the prescriptions were issued by others who are not presently identifiable, without the Referring Providers issuing, signing, authorizing, or even knowing about such prescriptions.

121.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were issued because of predetermined fraudulent protocols and not based upon medical necessity, the prescriptions purportedly issued by the Referring Providers were never given to the Insureds.

122.    Instead, the Insureds were provided with Fraudulent Equipment directly from the Clinic's receptionists or delivered directly to Insureds' homes without any interaction from the Defendants – to the extent that the Insureds actually received any Fraudulent Equipment.

123.    For the reasons set forth above, and below, in each of the claims identified  in Exhibit "1", the Defendants falsely represented that Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME or OD, and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were for medically

unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the Defendants pursuant agreements with others who are not presently identifiable.

### 1. The Predetermined Fraudulent Protocol at the 3rd Ave. Clinic

124. The 3rd Ave. Clinic was one of the Clinics where the Defendants conspired with others who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to a predetermined fraudulent protocol.

125. After their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibit "1" who purportedly received treatment at the 3rd Ave. Clinic were purportedly provided with initial examinations from a healthcare provider. After their purported initial examinations, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

126. When the Insureds went to the 3rd Ave. Clinic to obtain treatment for their purported motor vehicle accident injuries, the Insureds would see a variety of healthcare professionals who operated out of the 3rd Ave. Clinic.

127. When the Insureds sought treatment with and were purportedly provided with an initial evaluation by Referring Providers at the 3rd Ave. Clinic, they did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

128. Rather, Referring Providers at the 3rd Ave. Clinic purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol.

129. In keeping with the fact that the prescriptions purportedly issued by Referring Providers at the 3rd Ave. Clinic after purported initial examinations were not medically necessary

and were provided pursuant to a predetermined fraudulent protocol, virtually every Insured who underwent an initial examination at the 3rd Ave. Clinic received a prescription for virtually the same type of Fraudulent Equipment.

130.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination at the 3rd Ave. Clinic, Referring Providers purportedly prescribed, at a minimum, the following Fraudulent Equipment to virtually every Insured identified in Exhibit "1" that they treated at the 3rd Ave. Clinic: (i) "Cervical collar (2pc)"; (ii) "Cervical pillow"; (iii) "Lumbar cushion"; (iv) "LSO"; and (v) "Thermophore".

131.    To the extent that the Insureds identified in Exhibit "1" returned to the 3rd Ave. Clinic, Insureds would virtually always be provided with additional prescriptions for an additional set of Fraudulent Equipment purportedly issued to the Insureds by the Referring Providers.

132.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, Referring Providers virtually always purportedly prescribed the following Fraudulent Equipment to every Insured identified in Exhibit "1" that continued treating at the 3rd Ave. Clinic: (i) "Infrared heating lamp"; (ii) "Massager"; (iii) "EMS Unit"; and (iv) "EMS belt."

133.    In addition, and again regardless of each Insured's individualized circumstances or presentation, Referring Providers at the 3rd Ave. Clinic purportedly issued one or more separate additional prescriptions to Insureds for the following Fraudulent Equipment: (i) "LSO w APL Control"; and/or (ii) "Cervical Traction Unit w/ pump."

134.    In further keeping with the fact that the prescriptions for medically unnecessary Fraudulent Equipment purportedly issued to Insureds by the Referring Providers was pursuant to a predetermined fraudulent protocol, whenever an Insured who treated at the 3rd Ave. Clinic was issued a prescription for one or both of the items described above, the prescription was commonly dated on a day that the Referring provider did not examine or otherwise treat the Insured.

135.    In addition, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the 3rd Ave. Clinic was issued as part of a predetermined fraudulent protocol and issued without medical necessity, many Insureds who treated at the 3rd Ave. Clinic were issued at least one prescription for Fraudulent Equipment that was dated on a day that the Insureds was not examined or otherwise treated by the Referring Provider who purportedly issued the prescription.

136.    As part of the fraudulent scheme established between the Defendants and the 3rd Ave. Clinic, Insureds were issued multiple prescriptions for virtually identical Fraudulent Equipment described above, which were then routed directly to Dakiroks.

137.    In keeping with the fact that all the prescriptions purportedly issued to the Insureds identified in Exhibit "1" by Referring Providers at the 3rd Ave. Clinic were not medically necessary and were part of a predetermined fraudulent protocol, even when two or more Insureds were involved in the same underlying motor vehicle accident and received treatment at the 3rd Ave. Clinic, those Insureds routinely received the above-described virtually identical prescriptions for Fraudulent Equipment.

138.    For example:

(i)    On July 15, 2021, an Insured named WF was purportedly involved in a motor vehicle accident, being struck while cycling. WF purportedly started treating at the 3rd Ave. Clinic on or around August 12, 2021. After Gurvansh Anand, D.C. ("Anand") purportedly performed an initial examination on IF, Anand purportedly issued a prescription in the name of WF that was provided to Dakiroks for the following Fraudulent Equipment:

(i) "Cervical collar (2pc)"; (ii) "Cervical pillow"; (iii) "Lumbar cushion"; (iv) "LSO"; and (v) "Thermophore." On September 24, 2021, Anand purportedly issued two separate prescriptions in the name of WF that were both provided to Dakiroks for: (i) "LSO w/ APL Control"; and (ii) "Cervical traction unit w/pump", despite Anand not performing any examination or treatment on WF on that day. On September 27, 2021, Jordan Fersel, M.D. ("Fersel") purportedly performed a follow-up examination of WF and issued a prescription in the name of WF that was provided to Dakiroks for: (i) "Infrared heating lamp"; (ii) "Massager"; (iii) "EMS Unit"; and (iv) "EMS belt." On January 11, 2022, Fersel purportedly issued a prescription in the name of WF that was provided to Dakiroks for a "Shoulder Support (R)", despite Fersel not performing any examination or treatment on WF on that day.

(ii)    On August 20, 2021, an Insured named MV was purportedly involved in a motor vehicle accident. MV purportedly started treating at the 3rd Ave. Clinic on or around August 25, 2021. After Anand purportedly performed an initial examination on MV, Anand purportedly issued a prescription in the name of MV that was provided to Dakiroks for the following Fraudulent Equipment: (i) "Cervical collar (2pc)"; (ii) "Cervical pillow"; (iii) "Lumbar cushion"; (iv) "LSO"; and (v) "Thermophore." On September 13, 2021, Anand purportedly issued a prescription in the name of MV that was provided to Dakiroks for a "Cervical traction unit w/pump", despite Anand not performing any examination or treatment on MV on that day. On October 5, 2021, Fersel purportedly performed a follow-up examination of MV and issued a prescription in the name of MV that was provided to Dakiroks for: (i) "Infrared heating lamp"; (ii) "Massager"; and (iii) "EMS Unit."

(iii)    On September 10, 2021, an Insured named WC was purportedly involved in a motor vehicle accident while they were operating a scooter. WC purportedly started treating at the 3rd Ave. Clinic on or around September 14, 2021. After Anand purportedly performed an initial examination on WC, Anand purportedly issued a prescription in the name of WC that was provided to Dakiroks for the following Fraudulent Equipment: (i) "Cervical collar (2pc)"; (ii) "Cervical pillow"; (iii) "Lumbar cushion"; (iv) "LSO"; and (v) "Thermophore." On November 2, 2021, Fersel purportedly performed a follow-up examination of WC and issued a prescription in the name of WC that was provided to Dakiroks for: (i) "Infrared heating lamp"; (ii) "Massager"; (iii) "EMS Unit"; and (iv) "EMS Belt." On November 17, 2021, Anand purportedly issued two separate prescriptions in the name of WC that were both provided to Dakiroks for: (i) "LSO w/ APL Control"; and (ii) "Cervical traction unit w/pump", despite Anand not performing any examination or treatment on WC on that day.

(iv)    On October 11, 2021, two Insureds – MD and YD - were purportedly involved in a motor vehicle accident. MD and YD both purportedly started treating at the 3rd Ave. Clinic on or around October 13, 2021. After Anand purportedly performed initial examinations on MD and YD, Anand purportedly issued prescriptions in the names of MD and YD that were both provided to Dakiroks for the following Fraudulent Equipment: (i) "Cervical collar (2pc)"; (ii) "Cervical pillow"; (iii) "Lumbar cushion"; (iv) "LSO"; and (v) "Thermophore."  On November 23, 2021, Fersel purportedly performed a follow-up examination of MD, and on January 31, 2022 Fersel purportedly performed a follow-up examination of YD, and after both exams purportedly issued prescriptions in the name of MD and YD that were both provided to Dakiroks for: (i) "Infrared heating lamp"; (ii) "Massager"; (iii) "EMS Unit"; and (iv) "EMS Belt."  On November 17, 2021, Anand purportedly issued two separate prescriptions in the name of MD that were both provided to Dakiroks for: (i) "LSO w/ APL Control"; and (ii) "Cervical traction unit w/pump."  On September 26, 2022, Anand purportedly issued a prescription in the name of YD that was provided to a different DME supplier for a "LSO w/ APL Control", despite Anand not performing any examination or treatment on YD on that day.  On September 27, 2022, Anand purportedly issued a prescription in the name of YD that was provided to a different DME supplier for a "Cervical traction unit w/pump" despite Anand not performing any examination or treatment on YD on that day.

(v)    On October 20, 2021, an Insured named MW was purportedly involved in a motor vehicle accident. MW purportedly started treating at the 3rd Ave. Clinic on or around October 26, 2021. After Anand purportedly performed an initial examination on MW, Anand purportedly issued a prescription in the name of MW that was provided to Dakiroks for the following Fraudulent Equipment: (i) "Cervical collar (2pc)"; (ii) "Cervical pillow"; (iii) "Lumbar cushion"; (iv) "LSO"; and (v) "Thermophore."  On November 11, 2021, Anand purportedly issued a prescription in the name of MW that was provided to Dakiroks for a "Cervical traction unit w/pump."  On December 18, 2021, Melissa Rubin, P.A. ("Rubin") purportedly performed a follow-up examination of MW and issued a prescription in the name of MW that was provided to Dakiroks for: (i) "Infrared heating lamp"; (ii) "Massager"; and (iii) "EMS Unit."  On January 4, 2022, Fersel purportedly issued a prescription in the name of MW that was provided to Dakiroks for a "LSO w/ APL Control", despite Fersel not performing any examination or treatment on MW on that day.

(vi)    On November 21, 2021, three Insureds – EC, SO, and JC - were purportedly involved in a motor vehicle accident (JC was 14 years old at the time of the accident). EC and SO purportedly started treating at the 3rd Ave. Clinic on or around November 22, 2021, and JC purportedly started treating at the 3rd Ave. Clinic on December 14, 2022. After Anand purportedly performed

initial examinations on EC, SO, and JC, Anand purportedly issued prescriptions in the names of EC, SO, and JC that were each provided to Dakiroks for the following Fraudulent Equipment: (i) "Cervical collar (2pc)"; (ii) "Cervical pillow"; (iii) "Lumbar cushion"; (iv) "LSO"; and (v) "Thermophore." On February 1, 2022, Rubin purportedly performed a follow-up examination of EC, SO, and JC, and after each exam purportedly issued prescriptions in the names of EC, SO, and JC that were all provided to Dakiroks for: (i) "Infrared heating lamp"; (ii) "Massager"; (iii) "EMS Unit"; and (iv) "EMS Belt." On February 9, 2022, Anand purportedly issued two separate prescriptions each in the names of EC and SO that were all provided to Dakiroks for: (i) "LSO w/ APL Control"; and (ii) "Cervical traction unit w/pump", despite Anand not performing any examination or treatment on EC and SO on that day. On April 8, 2022, Anand purportedly issued a prescription in the name of JC that was provided to a Dakiroks for a "LSO w/ APL Control", despite Anand not performing any examination or treatment on JC on that day.

139.    These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that received treatment at the 3rd Ave. Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above.

140.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the 3rd Ave. Clinic were medically unnecessary and issued pursuant to a predetermined fraudulent protocol, an overwhelming majority of the Insureds who treated at the 3rd Ave. Clinic received multiple prescriptions for virtually the same type of Fraudulent Equipment, similar to the examples above, despite the fact that they were involved in relatively minor and low-impact motor vehicle accidents.

141.    In further keeping with the fact that the prescriptions for Fraudulent Equipment from the 3rd Ave. Clinic that were used to support the charges identified in Exhibit "1" were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, the contemporaneous dated medical records, such as an initial examination report or a follow-up examination report, virtually never identified any of the Fraudulent Equipment purportedly prescribed to the Insureds.

142.    In also keeping with the fact that the prescriptions for Fraudulent Equipment from the 3rd Ave. Clinic were not medically necessary and issued pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports did not contain any information to explain why any of the prescribed Fraudulent Equipment was medically necessary.

143.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the 3rd Ave. Clinic were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, when Insureds returned the Referring Provider for a follow-up examination, the contemporaneously dated examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of the previously prescribed Fraudulent Equipment.

144.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

145.    However, the follow-up examination reports from Referring Providers at the 3rd Ave. Clinic failed to include any information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date.

146.    Additionally, as part of the fraudulent scheme between the Defendants and unidentified third-party individuals, the prescriptions from the 3rd Ave. Clinic were never given to the Insureds but were routed directly to the Defendants, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the

prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the 3rd Ave. Clinic, without any interaction with or instruction concerning their use from either the Defendants or a healthcare provider.

147.    Also as part of the fraudulent scheme between the Defendants and unidentified third-party individuals, the prescriptions from the 3rd Ave. Clinic were purposefully generic and vague to allow the Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill Liberty Mutual and other New York automobile insurers, in order to increase their financial gain.

148.    By way of example, the prescriptions do not specify a type of cervical collar or lumbosacral support that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code. Instead, the prescriptions from the 3rd Ave. Clinic containing the phrases "cervical collar" and "LSO", which provided the Defendants with the ability to select a specific type of support that was more highly priced and profitable.

### 2. The Predetermined Fraudulent Protocol at the Myrtle Ave. Clinic

149.    The Myrtle Ave. Clinic was another of the Clinics where the Defendants conspired with others who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to a predetermined fraudulent protocol.

150.    Similar to the 3rd Ave. Clinic, subsequent to their involvement in minor "fender-bender" motor vehicle accidents, many of the Insureds identified in Exhibit "1" purportedly received treatment from a variety of healthcare professionals who operated out of the Myrtle Ave. Clinic

151.    In keeping with the fact that the prescriptions purportedly issued by the Referring Providers at the Myrtle Ave. Clinic subsequent to purported initial examinations were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who underwent an initial examination was issued a prescription for virtually the same type of Fraudulent Equipment.

152.    When the Insureds sought treatment with and were purportedly treated by Referring Providers at the Myrtle Ave. Clinic, they did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

153.    Instead, regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination at the Myrtle Ave. Clinic, Referring Providers virtually always prescribed the following Fraudulent Equipment to every Insured identified in Exhibit "1" that they treated: (i) "Bed board"; (ii) "Cervical collar"; (iii) "Egg crate mattress"; (iv) "Lumber (sp) support 10" back panel"; and (v) "TENS/EMS unit."

154.    In addition to the items described above, Insureds would also occasionally be prescribed a: (i) "Shoulder support"; or (ii) "Wrist support."

155.    In addition to all of the items described above, and again as part of the predetermined protocols established at the Myrtle Ave. Clinic, Insureds would also be issued multiple separate prescriptions for the rental of various pieces of DME such as a Sustained Acoustic Medicine ("SAM") unit or a Cold Compression Therapy Unit ("CTU"), that were provided by other DME providers.

156.    To the extent that the Insureds identified in Exhibit "1" returned to the Myrtle Ave. Clinic, the Insureds would frequently be provided at least one additional prescription for

Fraudulent Equipment that was usually provided to other DME providers, regardless which Referring Provider issued the prescription.

157. Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, Referring Providers virtually always purportedly prescribed at least one of the following Fraudulent Equipment to the Insureds identified in Exhibit "1" that continued treating at the Myrtle Ave. Clinic: (i) "Cervical traction w/ pump"; (ii) "LSO APL (Custom fitted)"; (iii) "Shoulder support (Custom fitted)."

158. In keeping with the fact that all the prescriptions purportedly issued to the Insureds identified in Exhibit "1" by Referring Providers at the Myrtle Ave. Clinic were not medically necessary and were part of a predetermined fraudulent protocol, when two or more Insureds were involved in the same underlying motor vehicle accident and received treatment at the Myrtle Ave. Clinic, those Insureds routinely received the above-described virtually identical prescriptions for Fraudulent Equipment.

159. In further keeping with the fact that the prescriptions for medically unnecessary Fraudulent Equipment purportedly issued to Insureds by the Referring Providers pursuant to a predetermined fraudulent protocol, virtually every Insured who treated at the Myrtle Ave. Clinic was issued at least one prescription for Fraudulent Equipment that was dated on a day that the Insured was not examined or otherwise treated by the Referring Provider who purportedly issued the prescription.

160. For example:

(i) On September 22, 2021, two Insureds – BA and VC - were both purportedly involved in a motor vehicle accident. BA and VC both purportedly started

treating at the Myrtle Ave. Clinic on or around September 22, 2021. After Muhammad Zakaria, M.D. ("Zakaria") purportedly performed initial examinations on BA and VC, Zakaria purportedly issued prescriptions in the names of BA and VC that were both provided to Dakiroks for the following Fraudulent Equipment: (i) "Bed board"; (ii) "Cervical collar"; (iii) "Egg crate mattress"; (iv) "Lumber support 10" back panel"; and (v) "TENS/EMS unit."  On October 12, 2021, Zakaria purportedly issued a prescription in the name of BA that was provided to Dakiroks for a "Shoulder support (Custom fitted) (R)", despite Zakaria not performing any examination or treatment on BA on that day.  On October 18, 2021, Sophia Mohuchy, D.C. ("Mohuchy") purportedly performed a follow-up examination of BA and VC, and after each exam purportedly issued prescriptions in the names of BA and VC that were provided to Dakiroks for: (i) "Cervical traction w pump"; and "LSO APL (Custom fitted)."  On October 27, 2021, Zakaria purportedly issued a prescription in the name of VC that was provided to a Dakiroks for a "Shoulder support (Custom fitted) (R)", despite Zakaria not performing any examination or treatment on VC on that day.

(ii)    On October 8, 2021, an Insured named RP was purportedly involved in a motor vehicle accident.  RP purportedly started treating at the Myrtle Ave. Clinic on or around October 13, 2021. After Zakaria purportedly performed an initial examination on RP, Zakaria purportedly issued a prescription in the name of RP that was provided to Dakiroks for the following Fraudulent Equipment: (i) "Bed board"; (ii) "Cervical collar"; (iii) "Egg crate mattress"; (iv) "Lumber support 10" back panel"; (v) "TENS/EMS unit"; and (vi) "Shoulder support."  On November 9, 2021, Zakaria purportedly issued a prescription in the name of RP that was provided to Dakiroks for a "Shoulder support (Custom fitted) (L)", despite Zakaria not performing any examination or treatment on RP on that day.  On November 22, 2021, Mohuchy purportedly issued a prescription in the name of RP that was provided to Dakiroks for: (i) "Cervical traction w pump"; and "LSO APL (Custom fitted)", despite Mohuchy not performing any examination or treatment on RP on that day.

(iii)    On December 12, 2021, three Insureds - KP, KH, and DA - were purportedly involved in a motor vehicle accident.  KP, KH, and DA all purportedly started treating at the Myrtle Ave. Clinic on or around December 15, 2021. After Zakaria purportedly performed an initial examination on KP, KH, and DA, Zakaria purportedly issued prescriptions in the names of KP, KH, and DA that were all provided to Dakiroks for the following Fraudulent Equipment: (i) "Bed board"; (ii) "Cervical collar"; (iii) "Egg crate mattress"; (iv) "Lumber support 10" back panel"; (v) "TENS/EMS unit"; and (vi) "Shoulder support."  Zakaria also purportedly issued prescriptions in the names of KP and DA for the 21-day rental of a "Cold compression therapy system" that was provided to a different DME

supplier. On March 1, 2022, Zakaria purportedly issued a prescription in the name of KP that was provided to a different DME supplier for a "Shoulder support (Custom fitted) (R) & (L)", despite Zakaria not performing any examination or treatment on KP on that day.  On March 2, 2022, Mohuchy purportedly issued a prescription in the name of KH, and on March 9, 2022 Mohuchy purportedly issued a prescription in the name of DA, that were provided to a different DME supplier for: (i) "Cervical traction w pump"; and "LSO APL (Custom fitted)", despite Mohuchy not performing any examination or treatment on KH or DA on those days.  On March 9, 2022, following a visit with Mohuchy, Mohuchy purportedly issued a prescription in the name of KP that was provided to a different DME supplier for: (i) "Cervical traction w pump"; and "LSO APL (Custom fitted)."  Also on March 9, 2022, following a visit with Zakaria, Zakaria purportedly issued a prescription in the name of KH that was provided to a different DME supplier for a "Shoulder support (Custom fitted) (R)."

(iv)     On December 19, 2021, an Insured named KA was purportedly involved in a motor vehicle accident.  KA purportedly started treating at the Myrtle Ave. Clinic on or around December 22, 2021. After Zakaria purportedly performed an initial examination on KA, Zakaria purportedly issued a prescription in the name of KA that was provided to Dakiroks for the following Fraudulent Equipment: (i) "Bed board"; (ii) "Egg crate mattress"; (iii) "Lumber support 10" back panel"; (iv) "TENS/EMS unit"; and (v) "Shoulder support" (although not prescribed, Dakiroks also provided KA with a "Cervical collar").  Zakaria also purportedly issued a prescription in the name of KA for the 21-day rental of a "Cold compression therapy system" that was provided to a different DME supplier.  On January 31, 2022, after a visit with Mohuchy, Mohuchy purportedly issued a prescription in the name of KA that was provided to Dakiroks for: (i) "Cervical traction w pump"; and "LSO APL (Custom fitted)."  Mohuchy also purportedly issued a prescription in the name of KA for the 4-week rental of a "Sustained Acoustic Medicine unit and coupling patches" that was provided to a different DME supplier.  On February 7, 2022, Zakaria purportedly issued a prescription in the name of KA that was provided to Dakiroks for a "Shoulder support (Custom fitted) (R)", despite Zakaria not performing any examination or treatment on KA on that day.

(v)     On February 1, 2022, an Insured named JD was purportedly involved in a motor vehicle accident.  JD purportedly started treating at the Myrtle Ave. Clinic on or around February 2, 2022. After Zakaria purportedly performed an initial examination on JD, Zakaria purportedly issued a prescription in the name of JD that was provided to Dakiroks for the following Fraudulent Equipment: (i) "Bed board"; (ii) "Cervical collar"; (iii) "Egg crate mattress"; (iv) "Lumber support 10" back panel"; (v) "TENS/EMS unit"; and (vi) "Shoulder support."  On March 1, 2022, Zakaria purportedly issued a prescription in the name of JD that was provided to a different DME

supplier for a "Shoulder support (Custom fitted) (L)", despite Zakaria not performing any examination or treatment on JD on that day.  On March 9, 2022, Mohuchy purportedly issued a prescription in the name of JD that was provided to a different DME supplier for: (i) "Cervical traction w pump"; and "LSO APL (Custom fitted)", despite Mohuchy not performing any examination or treatment on JD on that day.

(vi)    On February 5, 2022, two Insureds – SB and CG - were both purportedly involved in a motor vehicle accident.  SB started treating at the Myrtle Ave. Clinic on or around February 9, 2022 and CG started treating at the Myrtle Ave. Clinic on or around February 10, 2022.  After Zakaria purportedly performed initial examinations on SB and CG, Zakaria purportedly issued prescriptions in the names of SB and CG that were both provided to Dakiroks for the following Fraudulent Equipment: (i) "Bed board"; (ii) "Cervical collar"; (iii) "Egg crate mattress"; (iv) "Lumber support 10" back panel"; and (v) "TENS/EMS unit"; and (vi) "Shoulder support."  On March 1, 2022, Zakaria purportedly issued prescriptions in the name of SB and CG that were provided to a different DME supplier for a "Shoulder support (Custom fitted)", despite Zakaria not performing any examination or treatment on SB or CG on that day.   On March 2, 2022, Mohuchy purportedly issued prescriptions in the names of SB and CG that were provided to a different DME supplier for: (i) "Cervical traction w pump"; and "LSO APL (Custom fitted), despite Mohuchy not performing any examination or treatment on SB or CG on that day.  Mohuchy also purportedly issued a prescription in the name of CG for the 4-week rental of a "Sustained Acoustic Medicine unit and coupling patches" that was provided to a different DME supplier.

161.    These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that received treatment at the Myrtle Ave. Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above.

162.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Myrtle Ave. Clinic were medically unnecessary and issued pursuant to a predetermined fraudulent protocol, an overwhelming majority of the Insureds who treated at the Myrtle Ave. Clinic received multiple prescriptions for virtually the same type of Fraudulent Equipment, similar to the examples above, despite the fact that they were involved in relatively minor and low-impact motor vehicle accidents.

163.    Additionally, and in support of the fact that the prescriptions for Fraudulent Equipment were medically unnecessary and issued pursuant to a predetermined fraudulent protocol, prescriptions issued by Zakaria were never actually signed by him but instead used a signature stamp.

164.    Further, and in keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants by Referring Providers at the Myrtle Ave. Clinic were not medically necessary and provided pursuant to a predetermined fraudulent protocol, the Referring Providers who purportedly issued the prescriptions for Fraudulent Equipment virtually never had contemporaneously dated medical records, such as an examination report, that identified all of the Fraudulent Equipment listed on the prescriptions that the Defendants used to support the charges identified in Exhibit "1."

165.    Also, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Myrtle Ave. Clinic were not medically necessary and issued pursuant to a predetermined fraudulent protocol, the contemporaneous medical records did not contain any sufficient information to explain why any of the prescribed Fraudulent Equipment was medically necessary or how it would help the Insureds.

166.    Even more, and in keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, when the Insureds continued to seek treatment at the Myrtle Ave. Clinic, the follow-up examination reports generated by the Referring Providers virtually never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of the previously prescribed Fraudulent Equipment.

167.    Additionally, the prescriptions purportedly issued by Referring Providers at the Myrtle Ave. Clinic were never given to the Insureds but were routed directly to the Defendants, or other DME/OD suppliers, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Myrtle Ave. Clinic, without any interaction with or instruction concerning their use from the Defendants, other DME/OD suppliers, or a healthcare provider.

168.    As further part of the fraudulent scheme, the prescriptions purportedly issued by Referring Providers at the Myrtle Ave. Clinic were purposefully generic and vague so as to allow the Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill Liberty Mutual and other New York automobile insurers, in order to increase their financial gain.

169.    By way of example, rather than specifying the type of back cervical collar and lumbosacral support that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code – the Referring Providers at the Myrtle Ave. Clinic, purported to issue prescriptions containing the phrase "Cervical collar", "Lumber (sp) support 10" back panel", and "Shoulder support" with the intent of enabling the Defendants to select a specific type of support that was more highly priced and profitable, instead of issuing prescriptions for support braces that were actually needed in the first instance, to the extent they were actually needed at all.

**E.    The Unlawful Distribution of Fraudulent Equipment to Insureds by the Defendants Without Valid Prescriptions**

170.    Dakiroks is not a licensed medical professional corporation, and Pryzenko, to the extent she even exists, is not a licensed healthcare provider. As such, the Defendants were not

lawfully permitted to prescribe DME and OD to Insureds. For the same reason, the Defendants cannot properly dispense DME and/or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies the DME and/or OD to be provided.

171.    However, in many of the fraudulent claims identified in Exhibit "1", the Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider to the extent that they actually provided any DME or OD to the Insureds.

172.    More specifically, the prescriptions for DME and/or OD issued by the Referring Providers and provided to the Defendants were vague and generic because the prescriptions did not definitively identify the DME and/or OD to be provided. For example, the vague and generic prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Defendants to a unique type of DME and/or OD.

173.    These vague and generic prescriptions purportedly issued by the Referring Providers were intended to and actually provided the Defendants with the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule.

174.    In addition, in many of the fraudulent claims identified in Exhibit "1", the Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider because the Defendants provided Fraudulent Equipment that was not identified on the prescription.

175.    For example, in response to prescriptions for "TENS/EMS units", the Defendants virtually always billed Liberty Mutual for providing Insureds identified in Exhibit "1" with a "TENS unit." TENS Units and EMS Units are not the same and serve extremely different functions

with different reimbursement rates under the Fee Schedule.  An EMS unit is for *muscle* stimulation to decrease muscle spasms or promote muscle growth, while a TENS unit is for *nerve* stimulation to assist with pain management.

176.    In a legitimate clinical setting, a DME/OD retailer would contact the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements in order to dispense the appropriate DME and/or OD prescribed to each patient.

177.    Upon information and belief, the Defendants never contacted the Referring Provider to seek instruction and/or clarification, but rather made their own determination as to the specific Fraudulent Equipment purportedly provided to each Insured. Not surprisingly, the Defendants elected to provide the Insureds with Fraudulent Equipment that had a reimbursement rate in the higher-end of the permissible range under the Medicaid Fee Schedule.

178.    For example, many of the prescriptions that were used by the Defendants to support the charges identified in Exhibit "1" contained a vague description of a "LSO" or "Lumber (sp) support 10" back panel."  However, this vague and generic language directly relates to the over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds, including:

      (i)     HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $43.27.

      (ii)    HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

      (iii)   HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(iv)     HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.

(v)      HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(vi)     HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii)    HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $ 806.64.

(viii)   HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $ 1150.00.

(ix)     HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x)      HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi)     HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii)    HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xiii)   HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv)    HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xv)     HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvi)   HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xvii)   HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii) HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix)   HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xx)   HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi)   HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii)  HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii) HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

179.   As unlicensed healthcare providers, the Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured based upon a vague prescription for a "LSO" or "Lumber support 10" back panel."

180.   However, the Defendants never contacted the Referring Provider for clarification, and instead decided themselves which specific type of Fraudulent Equipment they would bill Liberty Mutual for, and accordingly purportedly provide the Insureds based upon the vague and generic prescriptions for Fraudulent Equipment.

181.    In fact, each and every time that the Defendants received a prescription from the Referring Providers for a "LSO" or "Lumber support 10" back panel" the Defendants, as part of their scheme, billed Liberty Mutual using HCPCS Code L0648 requesting a reimbursement of $708.65, and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to Liberty Mutual.

182.    Furthermore, each and every time that the Defendants received a prescription from the Referring Providers for a "LSO APL (Custom fitted)" or "LSO w APL Control", the Defendants, as part of their scheme, billed Liberty Mutual using HCPCS Code L0636 requesting a reimbursement of $1,036.35, and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to Liberty Mutual.

183.    These are only representative examples. To the extent that the Defendants actually provided Fraudulent Equipment, they unlawfully prescribed the Fraudulent Equipment for virtually all of the claims identified in Exhibit "1" that are based upon vague and generic prescriptions because the Defendants decided which specific items of DME and/or OD to provide to the Insureds.

184.    The Fraudulent Equipment provided to the Insureds identified Exhibit "1" – to the extent that the Fraudulent Equipment was actually provided – by the Defendants was not based on: (i) prescriptions by licensed healthcare providers containing sufficient detail to identify unique types DME and/or OD; or (ii) a determination by a licensed healthcare provider that the specific items dispensed to the Insureds were medically necessary. Rather, the Fraudulent Equipment identified in Exhibit "1" was the result of decisions by the Defendants.

185.    In all of the claims identified in Exhibit "1" that were based upon vague and generic language contained in the prescriptions, the Defendants falsely represented that the Fraudulent

Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME and/or OD issued by healthcare providers with lawful authority to do so. To the contrary, the Fraudulent Equipment was purportedly provided by the Defendants' own determination of what unique types of Fraudulent Equipment to purportedly provide, and, thus, was not eligible for reimbursement of No-Fault Benefits.

**F.    The Defendants' Fraudulent Billing for DME and/or OD**

186.    The bills submitted to Liberty Mutual and other New York automobile insurers by the Defendants were also fraudulent in that they misrepresented the DME and OD purportedly provided to the Insureds.

187.    In the bills and other documents submitted to Liberty Mutual, the Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were based upon some legitimate arms-length relationship, when the prescriptions for Fraudulent Equipment were based upon the unlawful financial arrangements between the Defendants and others who are not presently identifiable.

188.    In the bills and other documents submitted to Liberty Mutual, the Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to the unlawful financial arrangements between the Defendants, John Doe Defendants, and others who are presently unidentifiable.

189.    Further, the Defendants misrepresented in the bills submitted to Liberty Mutual that the Fraudulent Equipment purportedly provided to Insureds were based upon prescriptions issued

by licensed healthcare providers authorized to issue such prescriptions, when the Fraudulent Equipment purportedly provided was based upon decisions made by laypersons.

190.    Moreover, and as explained below, the bills submitted to Liberty Mutual by the Defendants misrepresented, to the extent that any Fraudulent Equipment was provided: (i) the Fee Schedule items matched the HCPCS Codes identified in the bills to Liberty Mutual, when they did not; and (ii) the charges for Non-Fee Schedule items were for permissible reimbursement rates, when they were not.

### 1.    The Defendants' Fraudulently Misrepresented the Fee Schedule items Purportedly Provided

191.    When the Defendants submitted bills to Liberty Mutual seeking payment for Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

192.    As indicated above, the New York Fee Schedule provides that the Medicaid Fee Schedule is used to determine the amount to pay for Fee Schedule items. The Medicaid Fee Schedule specifically defines the requirements for each HCPCS code used to bill for DME and/or OD.

193.    Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS code for both Fee Schedule items and Non-Fee Schedule items.

194.    By submitting bills to Liberty Mutual containing specific HCPCS Codes the Defendants represented that Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

195.    With the exception of certain codes, including those relating to positioning pillows/cushions under HCPCS Code E0190 and electric heating pads under HCPCS Code E0215,

in virtually all of the bills submitted to Liberty Mutual for Fee Schedule items, the Defendants fraudulently represented to Liberty Mutual that the HCPCS Codes were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

196.    The prescriptions from the healthcare providers contained vague and generic terms for Fraudulent Equipment to be provided to the Insureds. By contrast, the Defendants submitted bills to Liberty Mutual containing HCPCS codes that represented a more expensive tier of Fee Schedule items than necessary and that could be provided based upon the type of equipment identified in the vague and generic prescriptions.

197.    As indicated above, as part of the unlawful financial arrangements between the Defendants and others who are not presently identifiable, the Defendants were provided with prescriptions purportedly issued by the Referring Providers pursuant to predetermined fraudulent protocols, which provided the Defendants with the opportunity to increase the amount they could bill Liberty Mutual for Fraudulent Equipment purportedly provided to the Insureds.

198.    Accordingly, the Defendants obtained vague and generic prescriptions for Fraudulent Equipment that permitted them to choose between multiple types of products that would fit the vague description contained on the prescription.

199.    Although several options were available to the Defendants based upon the vague and generic prescriptions, the Defendants virtually always billed Liberty Mutual – and likely other New York automobile insurers – using HCPCS Codes with higher reimbursement amounts than necessary, which was done so for their financial benefit.

200.    However, despite billing for Fee Schedule items using HCPCS Codes that had higher than necessary reimbursement amounts, to the extent that the Defendants provided any

Fraudulent Equipment, the HCPCS codes in the bills submitted to Liberty Mutual severely misrepresented the type of Fee Schedule items purportedly provided to the Insureds.

201.    As identified in the claims contained within Exhibit "1", the Defendants frequently submitted bills to Liberty Mutual for Fraudulent Equipment that was purportedly "custom fitted" for each Insured when – to the extent that the Fraudulent Equipment was actually provided to the Insureds – the Defendants never customized the Fraudulent Equipment as billed.

202.    For example, the Defendants used the vague and generic language in the prescriptions purportedly issued from the Referring Providers to bill Liberty Mutual for the following: (i) a cervical collar using HCPCS Code L0190 with a charge of $311.75 per unit; (ii) a lumbar orthotic using HCPCS Code L0636 with a charge of $1,036.35 per unit; (iii) a shoulder orthotic using HCPCS Code L3674 with a charge of $896.92 per unit; (iv) a knee orthotic using HCPCS Code L1847 with a charge of $449.98 per unit; and (v) a knee orthotic using HCPCS Code L1844 with a charge of $1,107.70.

203.    However, the bills to Liberty Mutual for HCPCS Codes L1090, L0636, L3674, L1847, and L1844 fraudulently misrepresented the type of Fraudulent Equipment the Defendants purportedly provided to Insureds as the OD provided – to the extent that any OD was actually provided – were not reimbursable under the specific HCPCS Codes billed to Liberty Mutual.

204.    The products assigned to HCPCS Codes L1090, L0636, L3674, L1847, and L1844 are different types of OD that are required to be customized to fit a specific patient by an individual with expertise.

205.    However, despite billing Liberty Mutual – and likely other New York automobile insurers – using HCPCS Codes L1090, L0636, L3674, L1847, and L1844, the specific orthotic provided by the Defendants – to the extent that the Defendants provided the Insureds with any OD

– did not contain the requirements set forth in HCPCS Codes L1090, L0636, L3674, L1847, and L1844 because – at a minimum – the items were never customized to fit each patient.

206.    In keeping with the fact that the claims identified in Exhibit "1" for custom fitted OD, including the claims for HCPCS Codes L1090, L0636, L3674, L1847, and L1844 fraudulently misrepresented that the Defendants satisfied all the requirements for the billed HCPCS Codes, upon information and belief, the Defendants did not, and could not have, custom fit or fabricated the OD as required.

207.    To the extent that any of the charges identified in Exhibit "1" for custom fit or fabricated OD, including the claims for HCPCS Codes L1090, L0636, L3674, L1847, and L1844 were provided, the Defendants did not customize the equipment as required by Palmetto.

208.    In order to help clarify the term "custom fitted", Palmetto defined a custom fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

209.    One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which is for off-the-shelf orthotic means that "the beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final

fit or comfort (not all-inclusive) fall into this category." <u>See</u> Palmetto, <u>Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.</u>

210. By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." <u>See</u> Palmetto, <u>Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.</u>

211. In the claims identified in Exhibit "1" for custom fitted OD, including the claims for HCPCS Codes L1090, L0636, L3674, L1847, and L1844, the Defendants fraudulently misrepresented that the Defendants provided the Insureds with OD that was custom fitted as defined by Palmetto, by a certified orthotist.

212. Instead, to the extent that the Defendants provided any Fraudulent Equipment billed to Liberty Mutual as custom fitted OD, including the charges for HCPCS Codes L1090, L0636, L3674, L1847, and L1844, the Fraudulent Equipment was provided without taking any action to custom-fit the OD to the Insureds. To the extent that the Defendants attempted to make any adjustments to the DME received by Insureds identified in Exhibit "1", the Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

213.    In keeping with the fact that the Defendants misrepresented that they custom fitted the Insureds for the OD billed to Liberty Mutual, Pryzenko is not a certified orthotist and did not complete sufficient training to become a certified orthotist.

214.    In addition to submitting fraudulent charges for custom-fitted OD, the Defendants fraudulently misrepresented other Fee Schedule items purportedly provided to Insureds– to the extent that any Fraudulent Equipment was actually provided – and billed to Liberty Mutual in order to maximize profits.

215.    The claims identified in Exhibit "1" for HCPCS Code E2614 is an example of how the Defendants both fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

216.    Each of the claims identified within Exhibit "1" for HCPCS Code E2614 contained a charge of $491.77 based upon a prescription for a "Lumbar cushion."

217.    However, the product represented by HCPCS Code E2614 is defined as a positioning wheelchair cushion with a width of 22 inches or greater.

218.    Despite billing Liberty Mutual – and other New York automobile insurers – using HCPCS Code E2614, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item in response to the prescriptions for a lumbar cushion – were not positioning cushions for use with a wheelchair.

219.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibit "1", who were provided with a cushion by the Defendants that was billed to Liberty Mutual under HCPCS Code E2614, were in a wheelchair.

220. To the extent that any items were actually provided to the Insureds for the charges identified in Exhibit "1" under HCPCS Code E2614, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

221. Unlike the fraudulent charges for $491.77 for each "lumbar cushion" billed under HCPCS Code E2614 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud Liberty Mutual and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

222. In each of the claims identified within Exhibit "1" where the Defendants billed for Fraudulent Equipment under HCPCS Code E2614, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment in response to a prescription for wheelchair positioning cushion with a width of 22 inches or greater and that item satisfies the requirements of HCPCS Code E2614.

223. The claims identified in Exhibit "1" for HCPCS Code E0272 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

224. Each of the claims identified within Exhibit "1" for HCPCS Code E0272 contained a charge of $155.52 based upon prescriptions for an "egg crate mattress".

225. However, the product represented by HCPCS Code E0272 is defined as a foam rubber mattress, which is an actual mattress, not a mattress pad.

226. Despite billing Liberty Mutual – and other New York automobile insurers – using HCPCS Code E0272, the items provided by the Defendants – to the extent that the Defendants

provided the Insureds with any item – were not foam rubber mattresses as required by HCPCS Code E0272.

227.    By contrast, to the extent that any items were provided, they were mattress pads/toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code L0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

228.    Unlike the fraudulent charges for $155.52 for each eggcrate mattress billed under HCPCS Code E0272– and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud Liberty Mutual and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $19.48 for each mattress pad/topper billed under HCPCS Code L0199.

229.    In each of the claims identified within Exhibit "1" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0272, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0272.

230.    The claims identified in Exhibit "1" for HCPCS Code E0274 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

231.    The Defendants routinely submitted charges of $101.85 using HCPCS Code E0274 based upon prescriptions for a "bed board."

232.    However, the product represented by HCPCS Code E0274 is defined as an over-bed table and is a table akin to those found in hospitals that permit a bed-bound individual the use of a table while confined to a bed.

233.     By contrast, to the extent that any items were provided, they were bed boards, or large, flat pieces of cardboard that are put under a mattress to make the mattress firmer and can keep the mattress from sinking. A bed board is listed under HCPCS Code E0273, which is a Non-Fee Schedule Item.

234.     In each of the claims identified within Exhibit "1" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0274, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0274.

235.     The claims identified in Exhibit "1" for HCPCS Code E0762 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

236.     The Defendants routinely submitted charges of $422.44 using HCPCS Code E762 based upon prescriptions for a "TENS unit".

237.     However, the product represented by HCPCS Code E0762 is not a TENS Unit and is defined as a Transcutaneous Electrical Joint Stimulation Device ("TEJSD").

238.     By contrast, to the extent that any items were provided, they were TENS units (Transcutaneous Electrical Nerve Stimulation), which is different from a TEJSD as a TEJSD uses electrodes to stimulate the *joints* to aid in relieving arthritis pain in a joint, while a TENS unit uses electrodes to stimulate the *nerves* to assist with pain relief. A TENS Unit is listed under HCPCS Code E0730.

239.     Unlike the fraudulent charges for $422.44 for each TEJSD, billed under HCPCS Code E0762– and in keeping with the fact that the fraudulent charges were part of the Defendants'

scheme to defraud Liberty Mutual and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $76.25 for each TENS Unit billed under HCPCS Code E0730.

240.    In each of the claims identified within Exhibit "1" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0762, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0762.

241.    The claims identified in Exhibit "1" for HCPCS Code E0480 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

242.    The Defendants routinely submitted charges of $355.56 using HCPCS Code E0480 based upon prescriptions for a "massager."

243.    However, the product represented by HCPCS Code E0480 is defined as an airway clearance percussor used to help prevent aspiration, and HCPCS Code E0480 is used for providing or renting such device.

244.    By contrast, to the extent that any items were provided, they were personal massagers.  Personal massagers are Non-Fee Schedule items, which should have been billed under HCPCS Code E1399, with a reimbursement rate that is the lesser of 150% of the acquisition cost to the Defendants or the cost to the general public, and based upon information and belief, the permissible reimbursement rate was significantly less than the $355.56 charged by the Defendants.

245.    In each of the claims identified within Exhibit "1" where the Defendants billed for "massagers" under HCPCS Code E0480, each of the bills fraudulently mispresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0480.

246.    With the exception of the claims identified using HCPCS Codes E0190 and electric heating pads under HCPCS Code E0215, in each of the claims for Fee Schedule items identified within Exhibit "1", to the extent that any Fraudulent Equipment was actually provided, the Defendants fraudulently misrepresented the HCPCS Codes identified in their billing to Liberty Mutual in order to increase the amount of No-Fault Benefits they could obtain, and were therefore not eligible to collect No-Fault Benefits in the first instance.

### 2.    The Defendants' Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items

247.    When the Defendants' submitted bills to Liberty Mutual for Non-Fee Schedule items, the Defendants requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

248.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

249.    By submitting bills to Liberty Mutual for Non-Fee Schedule items, the Defendants represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

250.    However, in virtually all of the charges to Liberty Mutual identified in Exhibit "1" for Non-Fee Schedule items, the Defendants fraudulently represented to Liberty Mutual that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

251.    Instead, the Defendants submitted bills to Liberty Mutual with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order

to maximize the amount of No-Fault Benefits they were able to obtain from Liberty Mutual and other automobile insurers.

252.    The Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent that they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

253.    When the Defendants submitted bills to Liberty Mutual seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of the Defendants' acquisition cost of purportedly high-quality items. In actuality, the Defendants' legitimate acquisition cost for the low-quality items were significantly less.

254.    The Defendants, as part of their scheme, also either purposefully avoided researching the cost to the general public of the Non-Fee Schedule items that they purportedly provided because they knew that those items would be sold at significantly less than the charges they submitted to Liberty Mutual and other automobile insurers, or were aware that the cost to the general public of the Non-Fee Schedule items that they purportedly provided was significantly less than charges they submitted to Liberty Mutual and other automobile insurers yet continued to misrepresent the permissible reimbursement amount.

255.    In keeping with the fact that the Defendants fraudulently represented the permissible reimbursement amounts in the bills submitted to Liberty Mutual for the Non-Fee Schedule items solely for their financial benefit, the Defendants purposefully attempted to conceal their effort to overcharge Liberty Mutual for Non-Fee Schedule items by virtually never submitting a copy of their acquisition invoices in conjunction with their bills.

256.    The Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to Liberty Mutual

because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

257.    As part of the scheme, the charges the Defendants submitted to Liberty Mutual for Non-Fee Schedule items identified in Exhibit "1" virtually always misrepresented the permissible reimbursement amount.

258.    For example, the Defendants billed Liberty Mutual for infrared heat lamps under HCPCS Code E0205 with a charge of $385.47 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

259.    To the extent that any items were provided, the infrared lamps were low quality items and the permissible reimbursement rate was significantly less than the $385.47 charged by the Defendants.

260.    In virtually all of the charges submitted to Liberty Mutual for infrared heat lamps, the Defendants fraudulently sought reimbursement for $385.47 per unit when the maximum reimbursement charge was significantly less than $385.47.

261.    The Defendants also billed Liberty Mutual for EMS units under HCPCS Code E1399 with a charge of $482.28 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

262.    To the extent that any items were provided, the EMS units were low quality items and the permissible reimbursement rate was significantly less than the $482.28 charged by the Defendants.

263.    In virtually all of the charges submitted to Liberty Mutual for EMS units, the Defendants fraudulently sought reimbursement for $482.28 per unit when the maximum reimbursement charge was significantly less than $482.28.

264.    In each of the claims identified within Exhibit "1" for Non-Fee Schedule items, the Defendants fraudulently misrepresented in the bills submitted to Liberty Mutual that the charges were not in the Medicaid Fee Schedule and were the lesser of 150% of the acquisition cost or the cost to the general public. Therefore, the Defendants were not eligible to collect No-Fault Benefits in the first instance.

## III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to Liberty Mutual

265.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and/or treatment reports to Liberty Mutual through and in the name of Dakiroks, seeking payment for Fraudulent Equipment.

266.    The NF-3 forms, HCFA-1500 forms and treatment reports that Defendants submitted or caused to be submitted to Liberty Mutual were false and misleading in the following material respects:

    (i)    The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to Liberty Mutual that the Defendants provided Fraudulent Equipment pursuant to valid prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of the Fraudulent Equipment, Dakiroks was fraudulently incorporated and not properly licensed by the DCA as it did not obtain a Dealer for Products License.

    (ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to Liberty Mutual that the Defendants provided Fraudulent Equipment pursuant to valid prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of the Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with others who are not presently identifiable; (b) predetermined fraudulent protocols without regard for the medical necessity of the items; and (c) decisions made by laypersons not based upon lawful prescriptions from

licensed healthcare providers for medically necessary items.

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to Liberty Mutual that the Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, treatment notes, and delivery receipts.

(iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to Liberty Mutual the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that the Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – falsified the permissible reimbursement amounts for Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

## IV.    The Defendants' Fraudulent Concealment and Liberty Mutual's Justifiable Reliance

267.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to Liberty Mutual.

268.    To induce Liberty Mutual to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

269.    Specifically, Defendants knowingly misrepresented that Dakiroks was properly and legitimately incorporated and owned by Pryzenko, who does not appear to even exist.

270.    Furter Defendants knowingly misrepresented that Dakiroks was lawfully licensed by the City of New York and authorized to dispense DME/OD, even though it never complied with regulations requiring Dakiroks to obtain a Dealer in Products License from the DCA and concealed

this misrepresentation in order to submit bills to Liberty Mutual and prevent Liberty Mutual from discovering that Fraudulent Equipment was billed to Liberty Mutual for financial gain as part of a common fraudulent scheme.

271.    The Defendants also knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were not valid prescriptions based upon medical necessity but were obtained by Defendants as the result of unlawful financial arrangements and, in many instances, were unauthorized or utilized a signature stamp of the provider, and ultimately used as the basis to submit bills to Liberty Mutual in order to prevent Liberty Mutual from discovering that Fraudulent Equipment was billed to Liberty Mutual for financial gain as part of a common fraudulent scheme.

272.    Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment provided to the Defendants were – not based upon medical necessity but – based upon predetermined fraudulent protocols and ultimately used as the basis to submit bills to Liberty Mutual in order to prevent Liberty Mutual from discovering that Fraudulent Equipment was billed to Liberty Mutual for financial gain as part of a common fraudulent scheme.

273.    Furthermore, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME/OD, and not by an actual healthcare provider's prescription for medically necessary DME/OD, in order to prevent Liberty Mutual from discovering that Fraudulent Equipment was billed to Liberty Mutual for financial gain as part of a common fraudulent scheme.

274.    Even more, the Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to Liberty Mutual did not accurately reflect the type of Fraudulent Equipment provided to the Insureds

in order to prevent Liberty Mutual from discovering that Fraudulent Equipment was billed to Liberty Mutual for financial gain as part of a common fraudulent scheme.

275.    Lastly, the Defendants knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by the Defendants to Liberty Mutual and did not include any invoices to support the charges in order to prevent Liberty Mutual from discovering that Non-Fee Schedule items were billed to Liberty Mutual for financial gain as part of a common fraudulent scheme.

276.    Liberty Mutual maintains standard office practices and procedures that are designed to and do ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

277.    In accordance with the No-Fault Laws, and Liberty Mutual's standard office practices and procedures, Liberty Mutual either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through Dakiroks; (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through Dakiroks; (iii) timely issued payment with respect to the claims submitted through Dakiroks; or else (iv) the time in which to pay or deny the pending claims of No-Fault Benefits submitted through Dakiroks, or to request additional verification of those claims, has not expired.

278.    The Defendants also hired law firms to pursue collection of the fraudulent charges from Liberty Mutual and other insurers. These law firms routinely filed expensive and time-consuming litigation and arbitration against Liberty Mutual and other insurers if the charges were not promptly paid in full.

279.    The Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located through the metropolitan area.

280.    Liberty Mutual is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to Liberty Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause Liberty Mutual to rely upon them. As a result, Liberty Mutual incurred damages of more than $252,000.00 based upon the fraudulent charges representing payments made by Liberty Mutual to Dakiroks.

281.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from Liberty Mutual, Liberty Mutual did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Dakiroks**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

282.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

283.    There is an actual case in controversy between Liberty Mutual and Dakiroks -- regarding more than $215,000.00 in pending fraudulent no-fault insurance billing that has been submitted to Liberty Mutual in the name of Dakiroks.

284.    Dakiroks has no right to receive payment for any pending bills submitted to Liberty Mutual because it did not comply with all local licensing laws as it was fraudulently incorporated, not actually owned Pryzenko, and not entitled to No-Fault Benefits.

285.    Dakiroks has no right to receive payment for any pending bills submitted to Liberty Mutual because it did not comply with all local licensing laws as it was not lawfully licensed by the DCA as required by regulations from the City of New York, and did not obtain a Dealer in Products License as required in order to dispense DM/OD.

286.    Dakiroks also has no right to receive payment for any pending bills submitted to Liberty Mutual because the bills submitted to Liberty Mutual for Fraudulent Equipment were based – not upon medical necessity but – as a result of its participation in unlawful financial arrangements and often based on unauthorized prescriptions.

287.    Dakiroks has no right to receive payment for any pending bills submitted to Liberty Mutual because the bills submitted to Liberty Mutual were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, John Doe Defendants, and others who are not presently known, rather than to treat the Insureds.

288.    Dakiroks has no right to receive payment for any pending bills submitted to Liberty Mutual because Dakiroks purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

289.    Dakiroks has no right to receive payment for any pending bills submitted to Liberty Mutual because – to the extent Dakiroks actually provided any Fraudulent Equipment – Dakiroks fraudulently misrepresented the Fraudulent Equipment purportedly provided to Insureds as the

HCPCS Codes identified in the bills did not accurately represent the Fee Schedule items provided to the Insureds.

290.     Dakiroks has no right to receive payment for any pending bills submitted to Liberty Mutual because – to the extent Dakiroks provided any Fraudulent Equipment – Dakiroks fraudulently misrepresented that the charges for Non-Fee Schedule items contained within the bills to Liberty Mutual were less than or equal to the maximum permissible reimbursement amount.

291.     Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual under the name of Dakiroks.

## SECOND CAUSE OF ACTION
### Against Dakiroks and John Doe Defendants
### (Common Law Fraud)

292.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

293.     Dakiroks and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

294.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that Dakiroks was lawfully incorporated, owned by Pryzenko, and entitled to No-Fault Benefits when in fact Pryzenko either does not exist or was used a nominal owner to create the legitimacy of a valid corporation and conceal the involvement of the John Doe Defendants; (ii) in every claim that Dakiroks had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Dakiroks was not lawfully licensed as it never

obtained a Dealer in Products License; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements and often unauthorized or utilized a signature stamp, and not based upon medical necessity, which were used to financially enrich those that participated in the scheme; (iv) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to Liberty Mutual when in fact Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; and (vii) in many claims, to the extent that any Fraudulent Equipment was actually provided, the charges for Non-Fee Schedule items contained in the bills to Liberty Mutual misrepresented the permissible reimbursement amount.

295.    Dakiroks and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Dakiroks that were not compensable under the No-Fault Laws.

296.     Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $252,000.00 pursuant to the fraudulent bills submitted by Dakiroks.

297.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

298.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## <u>THIRD  CAUSE OF ACTION</u>
### Against Dakiroks and John Doe Defendants
### (Unjust Enrichment)

299.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

300.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

301.     When Liberty Mutual paid the bills and charges submitted by or on behalf of Dakiroks for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

302.     Dakiroks and the John Doe Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Dakiroks and the John Doe Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

303.     Dakiroks and the John Doe Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

304.    By reason of the above, Dakiroks and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $252,000.00.

## FOURTH CAUSE OF ACTION
### Against John Doe Defendants
### (Aiding and Abetting Fraud)

305.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

306.    John Doe Defendants 1-10 knowingly aided and abetted the fraudulent scheme perpetrated against Liberty Mutual by the Dakiroks.

307.    The acts of John Doe Defendants "1" - "10" in furtherance of the fraudulent scheme included, among other things: (i) secretly owning and controlling Dakiroks; (ii) ensuring that prescriptions for Fraudulent Equipment were routed to Dakiroks pursuant to pre-determined protocols lacking in medical necessity and in exchange for illegal kickbacks; and (iii) causing bills for Fraudulent Equipment to be submitted to Liberty Mutual.

308.    The conduct of John Doe Defendants "1" - "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" - "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Dakiroks to obtain payment from Liberty Mutual and other insurers.

309.    John Doe Defendants "1" - "10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Dakiroks for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

310.    The conduct of John Doe Defendants "1" - "10" caused Liberty Mutual to pay more than $252,000.00 pursuant to the fraudulent bills submitted through Dakiroks.

311.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

312.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief that the Court deems just and proper.

## JURY DEMAND

313.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Dakiroks, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Dakiroks has no right to receive payment for any pending bills submitted to Liberty Mutual;

B.    On the Second Cause of Action against Dakiroks and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $252,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C. On the Third Cause of Action against Dakiroks and John Doe Defendants, more than $252,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

D. On the Fourth Cause of Action against John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $252,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: May 2, 2023
     Uniondale, New York

               RIVKIN RADLER LLP

               By: *Michael A. Sirignano*
                  Michael A. Sirignano, Esq.
                  Barry I. Levy, Esq.
                  Frank P. Tiscione, Esq.
                  Philip P. Nash, Esq.
               926 RXR Plaza
               Uniondale, New York 11556
               (516) 357-3000

               *Counsel for Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company*